## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

NYLA FOSTER; LUC BENSIMON;
JESSICA HICKLIN; C.K.; and KANSAS
STATEWIDE TRANSGENDER
EDUCATION PROJECT,

                    *Plaintiffs*,

                v.

JEFF ANDERSEN, in his official capacity as
Secretary of the Kansas Department of Health
and Environment; ELIZABETH W. SAADI,
in her official capacity as State Registrar for
the State of Kansas; and KAY HAUG, in her
official capacity as Director of Vital Statistics
for the State of Kansas,

                  *Defendants*.

Civil Action No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Nyla Foster; Luc Bensimon; Jessica Hicklin; C.K.[1] (collectively, "Individual

Plaintiffs"); and Kansas Statewide Transgender Education Project (together with the "Individual

Plaintiffs," the "Plaintiffs"), by and through their attorneys, file this Complaint for Declaratory

and Injunctive Relief against Defendants Jeff Andersen, in his official capacity as Secretary of the

Kansas Department of Health and Environment; Elizabeth W. Saadi, in her official capacity as

State Registrar for the State of Kansas; and Kay Haug, in her official capacity as Director of Vital

Statistics for the State of Kansas (collectively, "Defendants"), and respectfully allege as follows:

---

[1] Plaintiff C.K. has filed a motion to proceed using his initials, rather than his full name, in order to protect his privacy regarding his transgender status and his medical condition and treatment.

## INTRODUCTION

1.      Plaintiffs are transgender persons born in Kansas and a Kansas-based organization that represents transgender people and their families in their efforts to foster a society free of discrimination.

2.      Individual Plaintiffs and transgender members of the Kansas Statewide Transgender Education Project ("K-STEP") wish to correct their respective Kansas birth certificates to accurately reflect their sex, consistent with their respective gender identities.  They seek access to birth certificates they can use without the unnecessary and potentially harmful disclosure of their transgender status and without being exposed to discrimination.

3.      Plaintiffs Nyla Foster and Jessica Hicklin are both women born in Kansas, yet the Kansas Department of Health and Environment and the Kansas Office of Vital Statistics incorrectly identifies them as male on their birth certificates.  Plaintiffs Luc Bensimon and C.K. are both men born in Kansas, yet the Kansas Department of Health and Environment and the Kansas Office of Vital Statistics incorrectly identifies them as female on their birth certificates. K-STEP's transgender members also have incorrect gender markers on their birth certificates.

4.      Accurate identity documents are essential to every person's ability to navigate through life.  Access to employment, education, housing, health care, banking, travel, and government services often depend on having documentation that accurately reflects a person's identity.  A birth certificate is a basic and ubiquitous identity document routinely relied upon in many of these settings to verify a person's identity.  Indeed, birth certificates are such a foundational identity document that they are not only used for many of these purposes, they are relied upon to obtain other essential identification documents.

2

5.      While the State of Kansas provides non-transgender (*i.e.*, cisgender) people born in Kansas with accurate birth certificates—birth certificates that reflect their true sex, consistent with their gender identity—the State of Kansas categorically bars transgender people from obtaining birth certificates that reflect their true sex, consistent with their gender identity (hereinafter the "Birth Certificate Policy").  To be sure, understanding the importance of having an accurate birth certificate for purposes of identification, the State of Kansas permits cisgender persons born in Kansas to correct the sex listed on their birth certificates, but specifically prohibits transgender persons born in Kansas from doing the same.

6.      In practical terms, Kansas's Birth Certificate Policy denies transgender persons born in Kansas access to birth certificates they can use.  This absolute refusal to issue accurate birth certificates to transgender persons, consistent with their gender identity, erects a significant barrier to the full recognition, participation, and inclusion of transgender people in society and subjects them to discrimination, invasions of privacy, harassment, humiliation, stigma, harm to their health, and even violence.

7.      The State of Kansas refuses to correct the gender marker on transgender people's birth certificates regardless of what steps a person may have taken (medically, socially, or legally) to live in a manner consistent with their gender identity.

8.      Kansas's Birth Certificate Policy stands in sharp contrast to the current approach of nearly every state in the United States (except Tennessee and Ohio, whose similar policy is presently being challenged in court), Puerto Rico, and the District of Columbia, all of which allow transgender persons to correct their birth certificates so that they accurately reflect their sex, consistent with their gender identity.  This categorical bar is also inconsistent with Kansas's own

policy of permitting transgender persons to correct the gender marker on their driver's licenses to match their gender identity.

9.     Kansas's Birth Certificate Policy, which each Defendant enforces, violates the United States Constitution's guarantees to equal dignity, equal protection of the laws, liberty, privacy, freedom of expression, and freedom from compelled speech.

10.     As confirmed by the practices adopted by nearly every other state or jurisdiction in this country, as well as Kansas's own policy permitting corrections to the gender marker on driver's licenses, there is no compelling, important, or even legitimate governmental justification to support Kansas's categorical refusal to provide transgender people with accurate birth certificates, consistent with their gender identities.

## JURISDICTION AND VENUE

11.     This action arises under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

12.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws and the Constitution of the United States and address the deprivation, under color of state law, of rights secured by the United States Constitution.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants reside within the District of Kansas, Defendants reside and have offices within the District of Kansas, and/or a substantial part of the events that gave rise to Plaintiffs' claims occurred, and will continue to occur, within the District of Kansas.

14.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

15.     This Court has personal jurisdiction over Defendants because they are domiciled in Kansas and/or have otherwise made and established contacts with Kansas sufficient to permit the exercise of personal jurisdiction over them.

## PARTIES

**Plaintiffs**

16.     Plaintiff Nyla Foster ("Ms. Foster") is a 30-year-old woman who was born in Kansas City, Kansas and currently resides in Kansas City, Missouri.  She is transgender.  Ms. Foster wishes to correct her Kansas birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

17.     Plaintiff Luc Bensimon ("Mr. Bensimon") is a 46-year-old man who was born and currently resides in Topeka, Kansas.  He is transgender.  Mr. Bensimon wishes to correct his Kansas birth certificate, which currently indicates his sex as female, to accurately reflect his sex as male, as determined by his gender identity.

18.     Plaintiff Jessica Hicklin ("Ms. Hicklin") is a 39-year-old woman who was born in Medicine Lodge, Kansas and is currently incarcerated at the Potosi Correctional Center in Mineral Point, Missouri.  She is transgender.  Ms. Hicklin wishes to correct her Kansas birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, as determined by her gender identity.

19.     Plaintiff C.K. is a 29-year-old man who was born in Wichita, Kansas and currently resides in Tulsa, Oklahoma.  He is transgender.  C.K. wishes to correct his Kansas birth certificate,

which currently indicates his sex as female, to accurately reflect his sex as male, as determined by his gender identity.

20.     The Kansas Statewide Transgender Education Project ("K-STEP") is a leading organization in Kansas advocating for a society free of discrimination against transgender, gender queer, gender nonconforming, and gender questioning individuals and their families through education, networking, and empowerment of leaders.  Many transgender members of K-STEP, including Plaintiff Luc Bensimon, wish to correct their Kansas birth certificates to accurately reflect their sex, consistent with their gender identities.

**Defendants**

21.     Defendant Jeff Andersen is sued in his official capacity as Secretary of the Kansas Department of Health and Environment.  In his capacity as Secretary of Health and Environment, Mr. Andersen enforces Kansas's vital statistics laws.  As part of his duties, pursuant to Kan. Stat. Ann. § 65-2402, Mr. Andersen directs and supervises Kansas's system of vital records; prescribes the forms for collection, transcription, compilation, and preservation of vital statistics; and directs, supervises, and controls the activities of all persons pertaining to the operation of Kansas's system of vital records.  Mr. Andersen has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to accurately reflect their sex, consistent with their gender identity.  Mr. Andersen's administration and enforcement of Kansas's vital statistics laws are actions under color of state law.  Mr. Andersen is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

22.     Defendant Elizabeth W. Saadi, Ph.D. is sued in her official capacity as State Registrar for the State of Kansas.  In her capacity as State Registrar, Dr. Saadi enforces Kansas's vital statistics laws.  As part of her duties, pursuant to Kan. Stat. Ann. § 65-2406, Dr. Saadi is

charged with the collection of vital statistics and is the custodian of all files and records, and with the obligation to enforce Kansas's vital statistics laws and their respective rules and regulations. Dr. Saadi has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to accurately reflect their sex, consistent with their gender identity. Dr. Saadi's administration and enforcement of Kansas's vital statistics laws are actions under color of state law. Dr. Saadi is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

23. Defendant Kay Haug is sued in her official capacity as Director of Vital Statistics for the State of Kansas. In this role, Ms. Haug exercises direct authority over the issuance, collection, processing, amendment, and correction of Kansas birth certificates. Ms. Haug has knowingly encouraged, condoned, and acquiesced in the acts barring Plaintiffs from correcting their birth certificates to accurately reflect their sex, consistent with their gender identity. Ms. Haug's administration and enforcement of Kansas's vital statistics laws are actions under color of state law. Ms. Haug is a person within the meaning of 42 U.S.C. § 1983 and has acted under color of state law at all times relevant to this Complaint.

## STATEMENT OF FACTS

**Background Information Regarding Sex, Gender Identity, and Gender Dysphoria**

24. A person has multiple sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics may not always be in alignment.

25. Gender identity—a person's fundamental, internal sense of their gender—is a core characteristic of human identity and the primary factor in determining a person's sex. Gender identity is innate and typically fixed at an early age. Every person has a gender identity.

26.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth.  Typically, a person is assigned a sex on their birth certificate solely on the basis of the appearance of external reproductive organs at the time of birth.  Other sex-related characteristics (such as a person's chromosomal makeup or gender identity, for example) typically are not assessed or considered at the time of birth.

27.     For the majority of people, their gender identity matches their sex assigned at birth.  That is not the case, however, for transgender people.

28.     Transgender persons are people whose gender identity diverges from the sex they were assigned at birth.  A transgender man's sex is male (even though he was assigned the sex of female at birth) and a transgender woman's sex is female (even though she was assigned the sex of male at birth).

29.     Cisgender persons are people whose gender identity aligns with the sex they were assigned at birth.  A cisgender man's sex is male (and was assigned the sex of male at birth) and a cisgender woman's sex is female (and was assigned the sex of female at birth).

30.     External reproductive organs are not always determinative of a person's sex.

31.     Where a person's sex-related characteristics are not in typical alignment with each other, gender identity is the critical determinant of that person's sex.

32.     Gender identity and transgender status are thus inextricably linked to one's sex and are sex-related characteristics.

33.     Attempts to change a person's gender identity to bring it into alignment with the person's assigned sex at birth are not only unsuccessful but also unethical and dangerous to the individual, risking psychological harm and even suicide.

34.     Living in a manner consistent with one's gender identity is critical to a person's health and well-being.  The discordance between one's gender identity and sex assigned at birth can sometimes cause clinically significant distress, a serious medical condition known as gender dysphoria.  Gender dysphoria, if improperly treated, can have serious health consequences, including psychological distress, anxiety, depression, suicidal ideation, and self-harm.  Gender dysphoria is recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013) ("DSM-V") and other leading medical and mental health professional groups, such as the American Medical Association and the American Psychological Association.  As such, treatment for gender dysphoria is governed by internationally recognized standards of care.

35.     The process by which transgender people come to live in a manner consistent with their gender identity, rather than their sex assigned at birth, is known as transition.  The refusal to treat a person in a manner consistent with their gender identity is harmful to that person's dignity and well-being.

36.     The steps that transgender people take to transition vary with each individual's specific needs, but these steps generally include one or more of the following: social transition, gender-affirming medical treatment, and/or gender-affirming surgical treatment.

37.     Social transition is defined as living in a manner consistent with one's gender identity, including one's presentation and social functioning.  For example, for a transgender woman, social transition might include changing her first name to one typically associated with women, changing her identity documents to indicate her sex as female, wearing clothing and adopting grooming habits typically associated with women, and otherwise presenting herself publicly as a woman in all aspects of her life.

38.     Social transition is a part of necessary medical treatment for many transgender people with gender dysphoria.  While social transition is adequate treatment for gender dysphoria for some transgender people, others may require medical care as well.

39.     Whether other treatment is medically necessary or even appropriate, however, depends on a person's individualized needs and health.  A person's ability to access treatment—particularly gender-affirming surgery—may also be limited by financial resources, insurance coverage, provider availability, and other barriers to health care access.

40.     The various components associated with transition—social transition and gender-affirming medical care—do not change a person's sex, but instead bring a person's physical appearance and lived experience into better alignment with their true sex, as determined by their gender identity.

41.     From a medical and scientific perspective, there is no basis for refusing to acknowledge a transgender person's true sex, as determined by their gender identity, based on whether that person has undergone particular surgeries or any other medical treatment.

42.     Depriving transgender people of birth certificates that match their gender identity harms their health and well-being.  This deprivation also interferes with the international standards of care for gender dysphoria by impeding a transgender person's ability to live in a manner consistent with their gender identity, and can aggravate symptoms of gender dysphoria.

**The Need for Accurate Birth Certificates Matching One's Gender Identity**

43.     A birth certificate is more than a piece of paper.  A birth certificate is a trusted and essential government-issued document that serves as proof of a person's identity.  For this reason, the government makes a copy of a birth certificate available to the person reflected on the birth certificate, rather than merely reserving for the government's own use.

44.     The birth certificate also reflects the government's recognition of a person's identity, including the person's sex, just as a marriage certificate reflects government recognition of a person's relationship.

45.     The use of birth certificates to demonstrate a person's identity is ubiquitous in our society.  Birth certificates are commonly used in a wide variety of contexts and are one of the primary ways of proving citizenship, for example.  In the ordinary course of life, a birth certificate is often required for determining eligibility for employment, obtaining other identity documents (including driver's licenses, state identification cards, social security cards, passports, and other state and federal identification documents), enrolling in school, proving age, or enrolling in governmental programs.

46.     Put simply, all people need access to a birth certificate that accurately reflects their identity.  However, transgender people born in Kansas, unlike cisgender people born in Kansas, do not have access to accurate birth certificates.

47.     For transgender people, the gender markers originally placed on their birth certificate are inaccurate because they are based on visual assumptions about their sex made at the time of their births.

48.     Many transgender people are perceived by others in accordance with their gender identity. Denying transgender people birth certificates that accurately reflect their sex, consistent with their gender identity, reveals private information in contexts where this information would otherwise remain undisclosed (*e.g.*, at a new job), regardless of whether a person's transgender status may otherwise be known to others (*e.g.*, to friends and family), and regardless of a person's desire not to disclose that personal information.  Transgender people denied accurate birth certificates are thus deprived of significant control over the circumstances surrounding disclosure

of their transgender status (and sometimes medical condition), including when, where, how, and to whom their transgender status is disclosed.

49.     A perceived mismatch between a transgender person's gender identity and the information on their birth certificate can often subject that person to invasions of privacy.  A person's transgender status (and for some, medical diagnosis of gender dysphoria) constitute deeply personal and sensitive information over which a transgender person has a reasonable expectation of privacy, and disclosure of which can jeopardize a person's safety and risk bodily harm.

50.     A mismatch between the gender marker on a person's birth certificate and the information on that person's other identity documents can also subject that person to harms such as interference with the person's ability to pass background checks and to obtain benefits that persons without a mismatch routinely enjoy.  In some circumstances, such a mismatch may constitute a total barrier to obtaining such benefits.

51.     More generally, transgender people experience substantial discrimination and harassment in a wide variety of settings, including employment, public accommodations, health care, and interactions with government employees and officials, including those in law enforcement.  Transgender people are disproportionately targeted for hate crimes.  These realities make the involuntary disclosure of a person's transgender status particularly harmful and dangerous.

52.     Furthermore, denying transgender persons accurate birth certificates, consistent with their gender identity, undermines, rather than serves, the purpose of verifying that a transgender person is, in fact, the same person reflected on that person's birth certificate.   For

example, forcing a transgender man to use a birth certificate that inaccurately states that he is female will cause others to question whether he is the same person reflected on the birth certificate.

**Kansas's Birth Certificate Policy**

53.     Vital records, including birth, death, marriage, and divorce records, in Kansas are not public records.

54.     Pursuant to the Uniform Vital Statistics Act, the Kansas Office of Vital Statistics receives and preserves vital records for events that occur in Kansas, such as births, deaths, marriages, and divorces.  As such, the Office of Vital Statistics exercises responsibility for the registration, issuance, correction, and changes to Kansas birth certificates.

55.     Pursuant to the Uniform Vital Statistics Act and Defendants' policies and procedures, Kansas birth certificates include, *inter alia*, the given name and surnames of the newborn child, the date of birth, the names of the child's parents, and the sex of the child.

56.     Upon information and belief, it is the practice of the State of Kansas to determine the sex of newborns, for purposes of their birth certificates, based solely on external genitalia.

57.     Recognizing that the information in a birth certificate may sometimes be inaccurate or need updating, the Uniform Vital Statistics Act and the regulations promulgated and enforced by Defendants permit the correction of errors and updating of birth certificate records.

58.     For example, pursuant to K.S.A. 65-2422a, in cases in which a person has lawfully changed their name, such person may present a duly authenticated copy of the court order changing their name and request a new certificate of birth.

59.     Similarly, pursuant to K.S.A. 25-2423(a), following the adoption of a child, a birth certificate reflecting only the names of the adoptive parents and in the new name of the adopted child must be substituted for the original registered birth certificate.  The original registration

certificate of the birth of the adoptee, decree of adoption, and other documents are kept under seal and can only be opened upon the demand of the adopted person if of legal age or by an order of court.

60.     And, pursuant to K.S.A. 65-2422c, Defendants may prescribe procedures for making minor corrections to birth certificates or records.

61.     Pursuant to Kan. Admin. Regs. 28-17-20, the sex listed on a person's birth certificate may be corrected if the change is substantiated with that person's affidavit, or a parent's affidavit if the person is under the age of 18, that the sex was incorrectly recorded and with medical records substantiating the registrant's sex at the time of birth.

62.     Indeed, on its public website, the Office of Vital Statistics states, "If your sex was listed incorrectly at the time of your birth, you need to provide our office with a notarized statement requesting that your sex or gender be corrected."

63.     However, Defendants enforce a policy, custom, or practice that categorically prohibits transgender persons born in Kansas from correcting the sex listed on their birth certificates so that it matches their true sex, consistent with their gender identity (the "Birth Certificate Policy").  No specific statute or regulation prohibits the correction of the gender marker on a birth certificate in order to accurately reflect the sex of a transgender person.

64.     So while Defendants have promulgated rules and regulations permitting the Defendants ability to correct the sex listed on a person's birth certificate in order to accurately identify the sex of such person, Defendants categorically prohibit transgender persons from correcting the sex listed on their birth certificates in a manner consistent with their gender identity.

65.     Kansas's Birth Certificate Policy stands in sharp contrast to the approach taken by forty-seven (47) other states, the District of Columbia, and Puerto Rico, all of which permit

transgender people to correct the gender marker on their birth certificates to accurately reflect their sex, consistent with their gender identity. These states typically do not require transgender persons to undergo particular medical procedures, such as surgery, in order to correct the sex listed on their birth certificates.

66.     Similarly, the U.S. Department of State permits corrections to the gender marker on a person's passport. Likewise, other federal agencies, such as the Social Security Administration, permit the correction of a transgender person's gender marker in their records.

67.     Kansas's Birth Certificate Policy also stands in stark contrast with Kansas's own policy permitting transgender people to correct the gender marker on their driver's licenses and state identification cards to accurately reflect their sex consistent with their gender identity. The Kansas Division of Motor Vehicles permits transgender persons to correct their driver's licenses and state identification cards so that these identification documents accurately reflect their sex consistent with their gender identity. Like the federal government, the Kansas Division of Motor Vehicles does not require transgender persons to have any particular medical procedure, such as surgery, to do so. Such practice is consistent with mainstream medical organizations, which support the correction of the gender marker in transgender people's identity documents, and oppose any requirement of specific medical care, including surgeries, in order for transgender people to make such corrections.

**Plaintiff Nyla Foster**

68.     Plaintiff Nyla Foster is a 30-year-old African-American woman who was born in Kansas City, Kansas and currently resides in Kansas City, Missouri. Ms. Foster wishes to correct her Kansas birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

69.     Ms. Foster is a community advocate who has dedicated much of her career to working with lesbian, gay, bisexual, transgender, and queer people who have experienced violence.  Ms. Foster is a former Project Coordinator & Advocate for the Kansas City Anti Violence Project, a non-profit organization dedicated to providing advocacy for LGBTQ people who have experienced domestic violence, sexual assault, hate crime, and neglect.  In addition, Ms. Foster is part of the leadership of the Trans Women of Color Collective, where she works to advance the transgender community through the art of pageantry, health advocacy, and service.

70.     Currently, Ms. Foster works at a Kansas City-based non-profit committed to providing housing and supportive services to homeless children, youth, families, men, and women with the goal of helping them move toward independence and self-sufficiency, and ending homelessness in the Kansas City community.

71.     Ms. Foster is transgender.  Although Ms. Foster was assigned male at birth, she is female.  Ms. Foster's identity as a woman is just as valid as that of women who were assigned female at birth.

72.     Ever since she was a young child, Ms. Foster knew that she was girl.  Not only was she uncomfortable with being identified and treated as a boy, as a young child, Ms. Foster was interested in toys and activities that were stereotypically associated with girls, including playing with dolls and acting and presenting in a typically feminine manner.

73.     By the time Ms. Foster was a teenager, Ms. Foster knew that she was transgender.  Ms. Foster knew she was a woman and identified as such.  She was "outed" as transgender to her mother by a family friend, and Ms. Foster's mother was supportive of her and her need to live her truth as a woman.

74.     Since beginning to live openly as a woman over fifteen years ago, Ms. Foster has taken steps to bring all aspects of her life into conformity with her gender identity, including steps to socially and medically transition.

75.     Ms. Foster has been diagnosed with gender dysphoria and has undergone clinically appropriate medical treatment.  These steps she has taken in her transition have brought Ms. Foster's body characteristics and outside appearance into alignment with her female gender identity.

76.     The general public perceives Ms. Foster as the woman she is.

77.     In addition to the medical transition steps Ms. Foster has taken, at the age of 14 years old, Ms. Foster began to live openly as a woman and was perceived as such by members of her community and family.

78.     However, after she began living openly as a girl, Ms. Foster was forced by her public school to take night classes, separate from the other students, because school officials considered her "transgender presence" to be disruptive to the learning environment.  As a result, Ms. Foster was forced to drop out of school.  Notwithstanding the discrimination she faced in school, Ms. Foster was able to obtain her high school diploma in 2007 after attending a local community college.

79.     Ms. Foster also corrected the gender marker on her driver's license.  She later legally changed her name from the traditionally male name she was given at birth to her current and traditionally female name, Nyla Foster, in 2008.  After obtaining a court order legally changing her name, Ms. Foster updated the name on her driver's license and with the Social Security Administration.

80.     Ms. Foster also sought to correct both her name and the gender marker on her birth certificate.  However, as a result of Kansas's Birth Certificate Policy, Ms. Foster has not been able to do so.  Because of Kansas's Birth Certificate Policy, Ms. Foster is prohibited from correcting the gender marker on her birth certificate.  Thus, for Ms. Foster, changing her name on her birth certificate would be futile as the birth certificate would still disclose her transgender status.

81.     Because of the Birth Certificate Policy, Ms. Foster's birth certificate still incorrectly identifies her as male, as she is currently prohibited from correcting the gender marker on this essential identity document.  As a result, Ms. Foster's birth certificate is inconsistent with her other identification documents.

82.     Ms. Foster reasonably fears that possessing a birth certificate that fails to accurately reflect her sex, consistent with her gender identity, increases the chances that she will be subjected to invasions of privacy, prejudice, discrimination, harassment, humiliation, or even violence.

83.     Presenting a birth certificate that incorrectly labels her as male and thus discloses her transgender identity leaves Ms. Foster susceptible to discrimination, particularly in the employment context.  For example, Ms. Foster has been required to present her birth certificate during job application processes.  Because her birth certificate inaccurately states that she is male, providing this document has led directly to Ms. Foster being "outed" as transgender, and subsequently treated suspiciously and disrespectfully by prospective employers.

84.     In addition, Ms. Foster is well aware of and personally familiar with the high incidence of harassment, discrimination, and violence directed at transgender people, particularly transgender women of color like herself, in Kansas and Missouri.  Indeed, Ms. Foster has first-hand experience with situations in which her physical safety has been threatened after her transgender identity was disclosed without her consent.

85.     Ms. Foster is stigmatized and harmed by Kansas's Birth Certificate Policy.

86.     As a result of Kansas's Birth Certificate Policy, Ms. Foster's current Kansas birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

87.     The refusal by the State of Kansas to recognize Ms. Foster's female identity impedes Ms. Foster's ability to function successfully as a woman in all aspects of her life. Presenting an identity document that identifies her as male is not only distressful but also dangerous, putting her at risk of discrimination and even violence.

88.     Moreover, Ms. Foster objects to the state's ideological message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

89.     Ms. Foster needs her identity documents to be congruent with who she is. She believes that her identity should be recognized and respected by the State of Kansas.

90.     Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to Ms. Foster, who is faced with the persistent reminder that Kansas does not respect her for who she is and does not recognize her personhood.

**Plaintiff Luc Bensimon**

91.     Plaintiff Luc Malik Bensimon is a 46-year-old African-American man who was born and currently resides in Topeka, Kansas.  Mr. Bensimon wishes to correct his Kansas birth certificate, which currently indicates that his sex is female, to accurately reflect his sex as male, as determined by his gender identity.

92.     Mr. Bensimon is an activist who advocates on behalf of transgender and gender nonconforming individuals, as well as for people with disabilities.  He is a founding member and is on the board of K-STEP, and is the Kansas representative for Black Transmen, Inc.  Mr. Bensimon lives with a mild form of cerebral palsy.

93.     Mr. Bensimon is transgender.  Although Mr. Bensimon was assigned female at birth, he is male.  Mr. Bensimon's identity as a man is just as valid as that of men who were assigned male at birth.

94.     Since a very young age, Mr. Bensimon has identified and presented in more stereotypically masculine ways.  However, it was not until he was nearly in his thirties that Mr. Bensimon finally could verbalize and understand how he felt—that he is a man.

95.     Since then, Mr. Bensimon has taken steps to bring all aspects of his life into conformity with his gender identity.  These steps have included clinically appropriate medical treatment, which have brought Mr. Bensimon's body characteristics and outside appearance into alignment with his male gender identity.

96.     The general public perceives Mr. Bensimon as the man he is.

97.     In addition to undergoing medical steps to bring his body into alignment with his male identity, Mr. Bensimon has taken several steps to socially transition in order to align his lived experience with his male gender identity.

98.     In 2010, Mr. Bensimon changed his name from the traditionally female name he was given at birth to his current and traditionally male name, Luc Malik Bensimon.  After obtaining a court order legally changing his name, Mr. Bensimon updated the name and corrected the gender marker on his Kansas driver's license and with the Social Security Administration.

99.     Mr. Bensimon also updated the name listed on his Kansas birth certificate and attempted to correct the gender marker.  However, under Kansas's Birth Certificate Policy, Mr. Bensimon was only able to update his name on his birth certificate and was not able to correct the gender marker.

100.    Because of the Birth Certificate Policy, Mr. Bensimon's birth certificate still incorrectly identifies him as female, as he is currently prohibited from correcting the gender marker on this essential identity document.  As a result, Mr. Bensimon's birth certificate is inconsistent with his other identification documents.

101.    Mr. Bensimon reasonably fears that possessing a birth certificate that fails to accurately reflect his sex, consistent with his gender identity, increases the chances that he will be subjected to invasions of privacy, prejudice, discrimination, harassment, humiliation, or even violence.

102.    Presenting a birth certificate that incorrectly labels him as female and thus discloses his transgender identity leaves Mr. Bensimon susceptible to discrimination and compounds the discrimination he already experiences as a person living with a disability.

103.    Mr. Bensimon has been required to present, and has presented, his birth certificate in a variety of contexts, including employment, and he will continue to be required to do so. Because people typically perceive Mr. Bensimon as male, those who see his birth certificate learn from that document that he is transgender regardless of whether he wishes to share that information with them.

104.    In addition, Mr. Bensimon is well aware of and personally familiar with the high incidence of harassment, discrimination, and violence directed at transgender people, particularly transgender people of color like himself, in Kansas and elsewhere.

105.    Mr. Bensimon is stigmatized and harmed by Kansas's Birth Certificate Policy.  To Mr. Bensimon the inability to have an accurate birth certificate consistent with his male gender identity represents a "mark of differentiation" forced upon him by the State of Kansas.

106.    As a result of Kansas's Birth Certificate Policy, Mr. Bensimon's current Kansas birth certificate reflects the sex he was incorrectly assigned at birth, erroneously stating that he is female and forcing him to use an identity document that inaccurately portrays his identity.

107.    The refusal by the State of Kansas to recognize Mr. Bensimon's male identity impedes Mr. Bensimon's ability to function successfully as a man in all aspects of his life. Presenting an identity document that identifies him as female is not only distressing but also dangerous, putting him at risk of discrimination and even violence.

108.    Moreover, Mr. Bensimon objects to the state's ideological message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

109.    Mr. Bensimon needs his identity documents to be congruent with who he is. He believes that his identity should be recognized and respected by the State of Kansas.

110.    Being denied a birth certificate that accurately reflects his sex, consistent with his gender identity, is psychologically and emotionally harmful to Mr. Bensimon, who is faced with the persistent reminder that Kansas does not respect him for who he is and does not recognize his personhood.

**Plaintiff Jessica Hicklin**

111.    Jessica Hicklin is a 39-year-old white woman who was born in Medicine Lodge, Kansas and is currently incarcerated in Mineral Point, Missouri.  Ms. Hicklin wishes to correct her

Kansas birth certificate, which currently indicates that her sex is male, to accurately reflect her sex as female, as determined by her gender identity.

112.    Ms. Hicklin is transgender.  Although Ms. Hicklin was assigned male at birth, she is female.  Ms. Hicklin's identity as a woman is just as valid as that of women who were assigned female at birth.

113.    From an early age, Ms. Hicklin experienced a marked incongruence between her internal sense of her own gender and the gender to which she was assigned at birth.

114.    For as long as she can remember, Ms. Hicklin has felt different and uncomfortable in her skin.  She recalls feeling most comfortable when playing dress-up by wearing traditionally female clothing or playing with her sister's dolls and with her female classmates.

115.    She felt uncomfortable with the contact sports she was expected to pursue, including football and basketball. She has always felt that her anatomy was wrong and did not understand why she did not have the same anatomy as other women.

116.    Since her childhood and teenage years, Ms. Hicklin knew that she was a woman and identified as such.

117.    Ms. Hicklin has experienced depression and anxiety associated with not being treated and recognized as a woman, consistent with her gender identity, and has sought treatment for the same since being incarcerated by the Missouri Department of Corrections ("MDOC") at age 16. Mental health providers employed by MDOC officially diagnosed Ms. Hicklin with gender dysphoria in 2015.

118.    In 2015, Ms. Hicklin began to socially transition in order to align her lived experience with her gender identity.

119.    Ms. Hicklin legally changed her name from the traditionally male name she was given at birth to her current and traditionally female name, Jessica Hicklin.  Following that change, Ms. Hicklin updated her MDOC offender ID card as well as her social security records to reflect her new name, consistent with her female gender identity.

120.    Ms. Hicklin also attempted to begin her medical transition in order to align her lived experience and body characteristics with her female gender identity in 2015, but she was unconstitutionally denied such gender-affirming, medically-necessary health care by MDOC and MDOC's contracted medical providers, pursuant to MDOC's then-in-force "freeze frame" policy, which permitted for the provision of gender-affirming health care only to those transgender inmates who were receiving it prior to incarceration.

121.    Following years of self-advocacy and successful litigation seeking to remedy Ms. Hicklin's constitutional rights, the U.S. District Court for the Eastern District of Missouri held that MDOC's "freeze frame" policy was unconstitutional and ordered that Ms. Hicklin be provided gender-affirming, medically-necessary health care as treatment for her gender dysphoria and that she be provided access to gender-affirming canteen items available to all other women at MDOC facilities.

122.    Accordingly, in February 2018, Ms. Hicklin began to medically transition in order to align her lived experience and body characteristics with her female gender identity.

123.    In addition to having corrected most of her identity documents, in 2015, Ms. Hicklin attempted to correct her Kansas birth certificate, which currently indicates her sex as male, to accurately reflect her sex as female, consistent with her gender identity.  However, Defendants only permitted Ms. Hicklin to update her name on her birth certificate and, pursuant to Kansas's Birth Certificate Policy, refused to correct the gender marker in Ms. Hicklin's birth certificate to

accurately reflect her sex as female.  Specifically, in a letter dated April 9, 2015, the Chief of the Registration and Amendment Section of the Kansas Office of Vital Statistics informed Ms. Hicklin that, "Based on K.S.A. 65-2422c and in re Estate of Gardiner, 29 Kan. App. 2nd 92 (2001), the Kansas Department of Health and Environment does not have the authority to amend gender, therefore we are denying your request."

124.    Accordingly, Ms. Hicklin's birth certificate fails to accurately reflect who she is and continues to incorrectly identify her as a male.

125.    As a result of Defendant's enforcement of the Birth Certificate Policy, Ms. Hicklin has suffered and continues to suffer harm.

126.    The continued misidentification of Ms. Hicklin as a male in her birth certificate imposes an undue and substantial burden on her ability to live as the woman she is.

127.    For example, when Ms. Hicklin attempted to correct the gender marker in her social security records to accurately reflect her sex as female, consistent with her gender identity, she was (incorrectly) denied the ability to do so because her birth certificate listed her sex as male.

128.    Defendant's refusal to provide Ms. Hicklin with a birth certificate that accurately reflects her sex as female has also interfered with her ability to socially transition in the penological context in which she currently lives.  For example, MDOC officials and staff still refer to Ms. Hicklin with male pronouns notwithstanding her female gender identity.  Upon information and belief, Ms. Hicklin believes that the use of male pronouns by MDOC officials and staff is based, in part, upon the incorrect designation of her sex as male on her birth certificate.  In addition, Ms. Hicklin reasonably believes that having a birth certificate accurately reflecting her sex as female would positively affect her rehabilitation and ability to reenter society.

129.    Ms. Hicklin is also aware of how transgender people regularly suffer discrimination, violence, and harassment in society, including in Kansas and Missouri, including when they have inconsistent or inaccurate identity documents.  Based in part on this awareness as well as her own experiences with discrimination and harassment due to her transgender status, Ms. Hicklin fears that having a birth certificate that inaccurately identifies her as male and outs her as transgender will interfere with her ability to re-enter society following her incarceration and to live as a woman.

130.    Defendant's enforcement of the Birth Certificate Policy also exacerbates Ms. Hicklin's gender dysphoria and interferes with her treatment for such medical condition.  Indeed, Ms. Hicklin describes the effect of being forced to possess an identity document that inaccurately identifies as male, as "being trapped by a piece of paper."

131.    Ms. Hicklin reasonably fears that possessing a birth certificate that fails to accurately reflect her sex, consistent with her gender identity, increases the chances that she will be subjected to invasion of privacy, prejudice, discrimination, distress, harassment, or violence.

132.    As a result of Kansas's Birth Certificate Policy, Ms. Hicklin's current Kansas birth certificate reflects the sex she was incorrectly assigned at birth, erroneously stating that she is male and forcing her to use an identity document that inaccurately portrays her identity.

133.    Moreover, Ms. Hicklin objects to the state's ideological message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

134.    Being denied a birth certificate that accurately reflects her sex, consistent with her gender identity, is psychologically and emotionally harmful to Ms. Hicklin, who is faced with the

persistent reminder that Kansas does not respect her for who she is and does not recognize her personhood.

**Plaintiff C.K.**

135.    C.K. is a 29-year-old white man who was born in Wichita, Kansas and currently lives in Tulsa, Oklahoma.  Plaintiff C.K. wishes to correct his Kansas birth certificate, which currently indicates that his sex is female, to accurately reflect his sex as male, as determined by his gender identity.  C.K. earned a bachelor's degree in social work from a university in Oklahoma. C.K. has been working as a social worker for three years, specializing in serving the needs of youth aging out of foster care in the Tulsa metropolitan area.

136.    C.K. is transgender.  Although C.K. was assigned female at birth, he is male.  C.K.'s identity as a man is just as valid as that of men who were assigned male at birth.

137.    During his early childhood, before he began to cut his hair short and dress in stereotypically masculine clothing, C.K. was uncomfortable being perceived as a girl.

138.    As early as the age of 8 years old, C.K. knew he was different from the other children assigned the sex of female at birth.  As a young child C.K. was always most interested in playing with his brother over his sisters and passionately enjoyed joining his father at his place of work, an auto body repair shop, to work on cars.

139.    By the time he was approximately 21 years old, C.K. had learned language to identify his experience as transgender and was able to understand the reason for his discomfort and distress growing up.  C.K. is a man who had incorrectly been designated the sex of female at birth.

140.     Thereafter, in 2013, C.K. began to socially and medically transition in order to align his lived experience and body characteristics with his male gender identity.  Since then, C.K. has lived as his true self—a man—in all aspects of his life.

141.     That year, C.K. was diagnosed with gender dysphoria.  In consultation with his medical and mental health professionals, C.K. began to undergo clinically appropriate medical treatment to relieve his gender dysphoria and bring his body into alignment with his gender identity.  The steps he has taken in his transition have brought C.K.'s body characteristics and outside appearance into alignment with his male identity.

142.     That same year, C.K. told his girlfriend at the time (now wife) that he was transgender and she was immediately supportive.  Not long after, C.K. shared his identity with his grandparents, who initially were tentatively accepting of his identity, and who were mostly focused on learning more about what it meant to be transgender.  C.K.'s grandparents now fully recognize him as the man that he is, including by referring to him with male pronouns, sending him "grandson" greeting cards, and being present for C.K.'s transition-related surgery.

143.     The general public and community perceive C.K. as the man he is.

144.     Indeed, C.K.'s transgender status is not publicly known, including by most of his co-workers.

145.     C.K. has sought to align his lived experience with his gender identity.

146.     In early 2014, C.K. legally changed his traditionally female name to a name traditionally associated with men.

147.     Following his legal name change, C.K. sought to update the name and correct the gender marker on his personal identity documents.

148.    C.K. updated his name and corrected his gender marker on his driver's license.  He also corrected his Social Security records.

149.    Following his legal name change, C.K. sought to correct both his name and the gender marker on his birth certificate.  However, as a result of Kansas's Birth Certificate Policy, C.K. has not been able to do so.  Because of Kansas's Birth Certificate Policy, C.K. is prohibited from correcting the gender marker on his birth certificate.  Thus, for C.K., changing his name on his birth certificate would be futile as the birth certificate would still disclose his transgender status.

150.    Accordingly, C.K.'s current birth certificate fails to accurately reflect who he is.  In addition, as a result of Kansas's Birth Certificate Policy, C.K.'s birth certificate and his other identification documents are inconsistent.

151.    Having a birth certificate that incorrectly identifies C.K. as female is a significant barrier to his ability to function successfully as a man in our society, including in seeking employment.

152.    For example, prospective employers have asked C.K. to provide his birth certificate to human resources after he had applied for a job.  And although this did not occur with his current employer, because his birth certificate inaccurately states that he is female, C.K. has been faced with a paralyzing silence from human resources staff, such that he has felt obligated to explain his transgender status to them.  Such occurrences have led to his being "outed" and disclosure of his status as a transgender man, as well as invasion of privacy, prejudice, discrimination, distress, embarrassment, and humiliation.  C.K. believes that such disclosure has also negatively impacted his ability to secure employment.

153.    Further, being forced to show an identity document that identifies him as female puts C.K. at significant risk of embarrassment and possible violence. It is psychologically and

emotionally harmful for C.K. to have a government-issued birth certificate that states incorrectly that he is female.

154.    C.K. is aware of the high incidence of violence and harassment directed at transgender persons in Oklahoma as well as the high rates of unemployment and housing discrimination faced by transgender persons in Oklahoma.

155.    C.K. reasonably fears that possessing a birth certificate that fails to accurately reflect his sex, as determined by his gender identity, increases the chances that he will be subjected to invasion of privacy, prejudice, discrimination, distress, harassment, or violence.

156.    As a result of Kansas's Birth Certificate Policy, C.K.'s current Kansas birth certificate reflects the sex he was incorrectly assigned at birth erroneously stating that he is female and forcing him to use an identity document that inaccurately portrays his identity.

157.    Moreover, C.K. objects to the state's ideological message that sex is determined solely by the appearance of external genitals at the time of birth, a message that is inconsistent with the scientific and medical understanding of sex.

158.    Being denied a birth certificate that accurately reflects his sex, as determined by his gender identity, is psychologically and emotionally harmful C.K., who is faced with the persistent reminder that Kansas does not respect him for who he is and does not recognize his personhood. C.K. remains in reasonable fear of what may happen as a result of having to present his birth certificate. Kansas's Birth Certificate Policy also subjects C.K. to potential physical harm, particularly as a transgender man residing in Oklahoma.

**Plaintiff Kansas Statewide Transgender Education Project ("K-STEP")**

159.    Plaintiff K-STEP is a non-profit organization incorporated in Kansas.  It is one of the leading organizations advocating for the equality and dignity of transgender, gender queer,

gender nonconforming, and gender questioning people and their families in Kansas.  It has members throughout the state and works collaboratively to secure, protect, and defend the equal civil rights and welfare of transgender people in Kansas.

160.    K-STEP is governed by a board of directors, of which Plaintiff Luc Bensimon is a member.  K-STEP's board and membership includes transgender persons who were born or reside within Kansas.

161.    As part of its efforts, K-STEP engages in public education, public advocacy, and plans events in support of the rights, equality, and dignity of transgender and gender nonconforming people in Kansas.  The promotion, achievement, and protection of the civil rights of transgender people and their families in Kansas is a priority for K-STEP.  As such, K-STEP has called for the ability of transgender persons born in Kansas to correct the gender marker on their birth certificates.

162.    As a result of Kansas's Birth Certificate Policy, transgender members of K-STEP born in Kansas have birth certificates that reflect the sex they were incorrectly assigned at birth.

163.    Transgender members of K-STEP, including Mr. Bensimon, wish to correct their Kansas birth certificates to accurately reflect their gender identity.

164.    Being denied birth certificates that accurately reflects their sex, as determined by their gender identity, is psychologically and emotionally harmful to transgender members of K-STEP, who are faced with the persistent reminder that the state of Kansas does not respect them for who they are and does not recognize their personhood, and who remain in reasonable fear of what may happen as a result of having to present their birth certificates.  Kansas's Birth Certificate Policy also subjects transgender members of K-STEP to potential physical harm, particularly in Kansas, where there is a high incidence of violence and discrimination against transgender people.

**Kansas's Birth Certificate Policy Harms Transgender People, Including Plaintiffs**

165.    Kansas's Birth Certificate Policy violates the fundamental right to privacy of the Individual Plaintiffs and K-STEP's transgender members by forcing the disclosure of highly personal and sensitive information, such as their transgender status and medical condition, to others whom the Individual Plaintiffs and transgender members of K-STEP might not trust or wish to know such information.

166.    The forced disclosure of the transgender status of the Individual Plaintiffs and K-STEP's transgender members impermissibly exposes them to prejudice, discrimination, distress, harassment, and even violence.  These concerns are particularly acute for transgender people, like Individual Plaintiffs and K-STEP's transgender members, who live in states, such as Kansas, Missouri, and Oklahoma, where transgender people face large amounts of violence and stigma. For example, according to the 2015 U.S. Trans Survey, twenty-four percent (24%) of transgender Kansans who have shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.  Similarly, one third (33%) of transgender people in neighboring Missouri and thirty-six percent (36%) of transgender people in Oklahoma who have shown an identification document with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.

167.    In addition, Kansas's Birth Certificate Policy unconstitutionally interferes with the ability of transgender people born in Kansas to participate in civic life.  For example, pursuant the Secure and Fair Elections Act enacted in 2011, the State of Kansas requires Kansas voters to show photographic identification when casting a vote in person.  In order to obtain a non-driver identification card, a person must present acceptable proof of identity and proof of residence.

Thus, transgender individuals who lack other forms of identification and desire to obtain a free non-driver identification card must obtain a birth certificate from the Kansas Office of Vital Statistics.  As such, some transgender people born and residing in Kansas, including some members of K-STEP, are forced to disclose their transgender status in order to exercise their fundamental right to vote.  Plaintiff Bensimon recalls the fear and concern expressed by members of the transgender community at the prospect of being required to disclose their transgender status in order to exercise their right to vote.

168.    Moreover, transgender people, whether or not they suffer from gender dysphoria, are harmed when they are prevented from taking steps to align their lived experience with their true sex, consistent with their gender identity.  The bar to having identification documents, such as a birth certificate, that reflect a transgender person's true sex, consistent with their gender identity, not only stigmatizes them, but also inhibits their ability to self-define and express their identity.

169.    When the government denies recognition of a transgender person's true sex, it is necessarily imposing significant harms on that individual.  The government's refusal to recognize a person's sex not only denies a transgender person equal dignity and respect by undermining— indeed denying—their very identity and existence, it also authorizes and invites other public and private entities to similarly discriminate and deny recognition.

170.    The State of Kansas's refusal to respect transgender persons' identities on the quintessential identity document—birth certificates—serves as a scarlet letter, a reminder that the States of Kansas considers transgender persons to be second-class citizens, unworthy of recognition, equal dignity, and respect.  Such refusal deprives transgender persons born in Kansas, including Plaintiffs, of their constitutional rights.

171.    At all times relevant hereto, Defendants' administration and enforcement of the Birth Certificate Policy are actions under color of state law.

172.    Plaintiffs have been, and continue to be, injured by Defendants' conduct.

## CAUSES OF ACTION

### COUNT I – DEPRIVATION OF EQUAL PROTECTION
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983

173.    Plaintiffs incorporate by reference and reallege all of the preceding paragraphs of this complaint as though fully set forth herein.

174.    Plaintiffs state this cause of action against all Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge Kansas's Birth Certificate Policy both facially and as applied to them.

175.    The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

176.    Kansas's Birth Certificate Policy treats transgender individuals differently than cisgender individuals who are similarly situated.

177.    Under Kansas's Birth Certificate Policy, cisgender individuals can have birth certificates that accurately reflect their sex and that are consistent with their gender identity, but transgender individuals cannot have birth certificates that accurately reflect their sex and that are consistent with their gender identity.

178.    The Birth Certificate Policy facially and intentionally discriminates against transgender persons based on sex-related considerations.  When the government lists a person's sex on their birth certificate, the government literally creates a classification based on sex.  In the

34

case of transgender individuals, however, this classification reflects a sex contrary to their true sex, as determined by their gender identity, causing harm as a result.

179.    Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender identity, transgender status, gender transition, and nonconformity with sex-based or gender-based stereotypes.

180.    The Birth Certificate Policy facially and intentionally discriminates based on transgender status by depriving transgender people who were born in Kansas—and them alone—of a birth certificate that accurately reflects their sex and that is consistent with their gender identity.

181.    Discrimination because a person is transgender is both discrimination based on sex, which requires courts to apply intermediate scrutiny when evaluating the constitutionality of the government's discrimination, and discrimination based on transgender status, which requires courts to apply strict or heightened scrutiny to such discrimination.

182.    Government discrimination against transgender people because of their transgender status bears the indicia of a suspect classification requiring heightened scrutiny by the courts.

    a.    Transgender people have suffered a long history of extreme discrimination and continue to suffer such discrimination to this day.

    b.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination, and have been and continue to be regularly targeted for discrimination by legislation, regulations, and other government action.

c.    A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

d.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.  Gender identity generally is fixed at an early age and highly resistant to change.

183.    The Birth Certificate Policy facially and intentionally discriminates based on sex and transgender status by depriving transgender persons, and only transgender persons, born in Kansas of an accurate birth certificate they can use without sacrificing their privacy, health, safety, dignity, and autonomy.

184.    By enforcing the Birth Certificate Policy, Defendants deny transgender people born in Kansas, including Individual Plaintiffs and transgender members of K-STEP, of their right to equal dignity, liberty, and autonomy because, unlike cisgender persons born in Kansas, transgender persons born in Kansas are deprived of a birth certificate that accurately reflects who they are.  The Birth Certificate Policy, thus, deprives transgender people born in Kansas, including Individual Plaintiffs and K-STEP's transgender members, their equality and dignity by stigmatizing them and branding them as second-class citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment.

185.    The Birth Certificate Policy is not narrowly tailored to further a compelling state interest, substantially related to an important government interest, or even rationally related to a legitimate governmental interest.

186.    The Birth Certificate Policy is maintained and motivated by animus towards transgender people.

187.    Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983 and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Kansas's Birth Certificate Policy unconstitutional and enjoining its enforcement.

### COUNT II – DEPRIVATION OF DUE PROCESS
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
### OF THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983

188.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 172 of this complaint as though fully set forth herein.

189.    Plaintiffs state this cause of action against all Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge Kansas's Birth Certificate Policy both facially and as applied to them.

190.    The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

191.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

192.    The substantive protections of the Due Process Clause, as well as other constitutional provisions giving rise to a right to privacy, protect information that is highly personal and intimate as well as information that could lead to bodily harm upon disclosure.  Government infringement of these protections requires courts to apply strict scrutiny to such government action.

193.    The fact that an individual is transgender constitutes highly personal and intimate information.  A reasonable individual would find the involuntary disclosure of one's transgender status to be deeply intrusive.

194.     The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity in jeopardy.  This harm burdens and interferes with the ability of transgender individuals to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

195.     The Birth Certificate Policy violates transgender individuals' right to privacy by causing disclosures of their transgender status and depriving them of significant control over the circumstances around such disclosure.

196.     There are no adequate safeguards to prevent the harm caused by the involuntary disclosure of one's transgender status.  For example, an individual may need to disclose his or her birth certificate directly to third parties, without any of the privacy safeguards that may exist when the government discloses information to third parties.

197.     The substantive protections of the Due Process Clause also protect the right of every individual to the possession and control of their own person, and to define and express their identity.  They extend to personal decisions central to individual dignity and autonomy, including intimate decisions that define personal identity.

198.     The fundamental right to autonomy encompasses the right to define and express one's gender identity, including a right not to be treated in a manner contrary to one's sex, as defined by one's gender identity, by the government.  The right to define and express one's gender identity is indeed among the most intimate imaginable, relating to matters that individuals are uniquely positioned to understand and define for themselves.

199.     When the government identifies individuals by their sex in official documents, the constitutional protections that shelter individual and bodily autonomy, dignity, and personhood

prohibit the government from interfering with the right to live in accordance with one's gender identity.

200.    By enforcing their Birth Certificate Policy, Defendants unduly burden and unconstitutionally interfere with the fundamental right to autonomy in one's person and identity of transgender individuals born in Kansas, including Plaintiffs.

201.    As a result of the Birth Certificate Policy, the Individual Plaintiffs and K-STEP's transgender members are deprived of a quintessential identity document that accurately reflects who they are, thereby infringing on their fundamental liberty in self-definition and autonomy in their person and identity.

202.    There is no compelling or even legitimate interest justifying the government's causing transgender people to involuntarily disclose their transgender status to third parties every time they present their birth certificate to such individuals.

203.    There is no compelling or even legitimate interest justifying the government's interference with the right to autonomy in one's person and identity of transgender individuals.

204.    Accordingly, Defendants are liable for their violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983 and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Kansas's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## COUNT III – ABRIDGEMENT OF FREE SPEECH
## IN VIOLATION OF THE FIRST AMENDMENT
## OF THE UNITED STATES CONSTITUTION
## 42 U.S.C. § 1983

205.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 172 of this complaint as though fully set forth herein.

206.    Plaintiffs state this cause of action against all Defendants for purposes of seeking declaratory and injunctive relief, and challenge Kansas's Birth Certificate Policy both facially and as applied to them.

207.    The First Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983 and applicable to the states through the Fourteenth Amendment, provides that a state "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

208.    The freedom of speech protected by the First Amendment is multifaceted. The First Amendment protects an individual's rights to speak and to refrain from speaking.

209.    The Birth Certificate Policy violates the First Amendment right of transgender people, including the Individual Plaintiffs and K-STEP's transgender members, to refrain from speaking. The Birth Certificate Policy forces transgender people to identify with a sex and identity that was incorrectly assigned to them and that conflicts with who they are.

210.    The Birth Certificate Policy also forces transgender people to disclose their transgender status, thereby compelling them to disclose private, sensitive, and personal information that they may not want to be publicly known or that may expose them to discrimination, harassment, and violence.

211.    The Birth Certificate Policy further violates the First Amendment by forcing transgender people, including the Individual Plaintiffs and K-STEP's transgender members, to endorse the State of Kansas's position as to their own gender, as well as on the meaning of sex generally, through a birth certificate they must show to others. The gender marker listed on Plaintiffs' birth certificates conveys the state's ideological message that sex is determined solely by the appearance of external reproductive organs at the time of birth and never deviates from

that—a message that is inconsistent with the medical and scientific understanding of sex and to which Plaintiffs strongly object.

212.   The Birth Certificate Policy violates the First Amendment right of transgender people, including the Individual Plaintiffs and K-STEP's transgender members, to speak by preventing them from accurately expressing their gender.

213.   The Birth Certificate Policy is not narrowly tailored to serve any compelling governmental interest.

214.   Accordingly, Defendants are liable for their violation of Plaintiffs' First Amendment rights under 42 U.S.C. § 1983 and Plaintiffs are entitled to declaratory and injunctive relief against Defendants declaring Kansas's Birth Certificate Policy unconstitutional and enjoining its enforcement.

## PRAYER FOR RELIEF

*WHEREFORE*, Plaintiffs respectfully request that the Court enter Judgment in their favor and against Defendants on all claims as follows:

a.   Enter a declaratory judgment that the actions of Defendants complained of herein, including the enforcement of Kansas's Birth Certificate Policy, are in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and the Free Speech Clause of the First Amendment to the United States Constitution;

b.   Permanently enjoin Defendants from enforcing the Birth Certificate Policy, including requiring Defendants to provide birth certificates to transgender individuals that accurately reflect their sex, consistent with their gender identity, without the inclusion of information that would, directly or indirectly, disclose an individual's transgender status on the face of the birth certificate;

c.      Award Plaintiffs costs, expenses, and reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

d.      Grant such other and further relief in favor of Plaintiffs as this Court deems just, equitable, and proper.

## PLACE FOR TRIAL

Pursuant to D. Kan. Local Rule 40.2, Plaintiff designates Kansas City as the place for trial.

Dated on this 15th day of October, 2018.

Respectfully submitted,

/s/ James D. Lawrence ____
James D. Lawrence (Bar No. KS #22565)
Sarah R. Holdmeyer (Bar No. KS #27584)
BRYAN CAVE LEIGHTON PAISNER LLP
One Kansas City Place
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
t: (816) 374-3200 | f: (816) 374-3300
jdlawrence@bclplaw.com
sarah.holdmeyer@bclplaw.com

Katherine A. Keating*
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
t: (415) 675-3400 | f: (415) 675-3434
katherine.keating@bclplaw.com

/s/ Omar Gonzalez-Pagan ____
Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
        EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
t: (212) 809-8585 | f: (212) 809-0055
ogonzalez-pagan@lambdalegal.org

Kara N. Ingelhart*
LAMBDA LEGAL DEFENSE AND
        EDUCATION FUND, INC.
105 West Adams Street, Suite 2600
Chicago, Illinois 60603
t: (312) 663-4413 | f: (312) 663-4307
kingelhart@lambdalegal.org

*Attorneys for Plaintiffs*

* Application for admission *pro hac vice* forthcoming.