# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NYLA FOSTER,<br>LUC BENSIMON,<br>JESSICA HICKLIN,<br>C.K., and<br>KANSAS STATEWIDE<br>  TRANSGENDER PROJECT,<br><br>    Plaintiffs,<br><br>      v.<br><br>JANET STANEK, in her official capacity<br>  as Secretary of the Kansas Department<br>  of Health and Environment,<br>KAY HAUG, in her official capacity as<br>  State Registrar for the State of Kansas,<br>  and<br>JASON MATHEWSON, in his official<br>  capacity as Director of Vital Statistics for<br>  the State of Kansas,<br><br>    Defendants. | Case No. 2:18-cv-02552-DDC-KGG |

## REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT

1. **THIS COURT HAS NOT HELD THAT IT IS UNCONSTITUTIONAL FOR KANSAS TO ISSUE BIRTH CERTIFICATES THAT DISPLAY A PERSON'S SEX AT BIRTH.**

"[T]he central characteristic of a consent judgment is that the court has not actually resolved the substance of the issues presented." 18A Charles A. Wright et al., *Federal Practice and Procedure* § 4443 (2023) (citing *Nichols v. Bd. of Cty. Comm'rs*, 506 F.3d 962, 967–69 (10th Cir. 2007); *Mizuho Corp. Bank v. Cory & Assocs.*, 341 F.3d 644, 653 (7th Cir. 2003); *In re Kane*, 254 F.3d 325, 329 (1st Cir. 2001); *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 154 (4th Cir. 1995); *Crumpton v. Bridgeport Educ. Ass'n*, 993 F.2d 1023, 1029 (2d Cir. 1993)). Plaintiffs fail to acknowledge this black-letter law. And that failure leads them to make wobbly arguments premised on an unsound assertion—namely, that a state

policy requiring birth certificates to reflect a person's biological sex (rather than some felt gender identity) is unconstitutional.

The problem with Plaintiffs' arguments is that the Court made no such holding. That constitutional issue was not the subject of any presentation of evidence, nor was it the subject of any briefing or other argument by the parties. The Court did not even address it in the context of a preliminary injunction motion. Before the parties asked the Court to enter their consent judgment, the only substantive motion that had even been filed was a motion to proceed pseudonymously, ECF No. 4, which ultimately went unopposed, Order, Jan. 25, 2019, at 1–2, ECF No. 21. In other words, there was not a single clash between the parties that required the Court to decide anything at all—let alone anything related to the constitutionality of recording a person's biological sex on his or her birth certificate.

Thus, Plaintiffs' reliance on the Supremacy Clause, constitutional avoidance, and other arguments that require the Court to presume the unconstitutionality of issuing sex-at-birth birth certificates, *see* Resp. 7–11, 14, ECF No. 40, is simply a non sequitur. The State's policy is constitutional, and nothing in the consent judgment requires this Court to pretend otherwise.

It is true that the parties agreed, for the purpose of establishing the reasonableness of the proposed consent judgment,[1] that the discretionary policy then in place "violate[d] the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment."[2] Consent J. 2–3, ECF No. 33. But that declaration made no

---

[1] "[T]he district court must ensure that the [proposed consent judgment] is not illegal . . . . The court also has the duty to decide whether the decree is fair, adequate, and reasonable before it is approved." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991).

[2] Plaintiffs' response also claims that requiring sex at birth on birth certificates "would result in the violation of the free speech rights of transgender people born in Kansas." Resp. 14. (Their complaint made the same claim. Compl. ¶¶ 205–14, ECF No. 1.) But

2

mention of SB 180, which was not even introduced until several legislative sessions had come and gone following the entry of judgment. Nor is SB 180 simply a re-adoption of the previous policy. One of Plaintiffs' arguments against the constitutionality of the former policy was that Kansas already allowed people to change the sex on their driver's licenses (which allegedly demonstrated the lack of any legitimate interest in not changing birth certificates). Compl. ¶¶ 8, 10, 67. But if that was a flaw—and Defendants do not concede that it was, *accord Fowler v. Stitt*, No. 22-cv-115-JWB-SH, 2023 WL 4010694, at *23 (N.D. Okla. June 8, 2023) (Broomes, J.)—SB 180 remedied it: both driver's licenses and birth certificates now must reflect sex at birth. Kan. Att'y Gen. Op. 2023-2, at 3–4, 6, *available at* https://bit.ly/3rIOcbV; *see also* Order on Mot. to Dissolve TRO 4, *State ex rel. Kobach v. Harper*, No. SN-2023-CV-422 (Shawnee Cty. Dist. Ct. July 12, 2023) (rejecting argument that SB 180 does not apply to driver's licenses) (attached as Ex. A).

Furthermore, even if one were to extrapolate the parties' recitation to all future laws with similar features,[3] the bottom line is that "it is the agreement of the parties, rather than the force of law upon which the complaint was originally based, that creates the obligations embodied in a consent decree." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986). And, here, the agreement itself allows

---

even the consent judgment did not adopt that doubtful position, and it suffers from the obvious flaws that the birth certificate (a) is a document created by the state rather than a statement made by the individual and (b) is a certification of a factual event rather than an expression of individual ideas or concepts. Defendants are not aware of any court that has taken Plaintiffs' view.

[3] The judgment ambiguously refers to "Kansas statutes and regulations . . . which prohibits [*sic*] transgender people born in Kansas from obtaining birth certificates reflecting their true sex, consistent with their gender identity . . . ." Consent J. 2. Nonetheless, Plaintiffs' suit was plainly directed at a specific, then-existing, discretionary policy that was not compelled by any statute or regulation. *See* Compl. ¶¶ 63–64

Defendants to seek modification of the judgment under Fed. R. Civ. P. 60. Consent J. 2.[4] It is odd to suggest that the terms of the agreement implicitly limit modifications when the agreement itself explicitly recognizes the possibility of them; Plaintiffs can hardly complain that Defendants are seeking to avail themselves of their rights under that agreement.

2. CHANGES IN STATE LAW CAN SUPPORT A FED. R. CIV. P. 60(B) MODIFICATION JUST AS MUCH AS CHANGES TO FEDERAL LAW.

Moving on to the standards for a Rule 60(b) modification, then: Plaintiffs wrongly suggest that only changes to *federal* law can warrant modifying a consent judgment. *See* Resp. 7 & n.3. But that is not the rule. It is true that most cases involving modifications due to a change in law involve federal statutes; this should be unsurprising given that we're talking about federal courts, which spend much of their time analyzing federal laws. But state statutes do make appearances in the Rule 60(b) caselaw, and Defendants are not aware of any case that suggests a per se bar to state law affecting a consent judgment (nor do Plaintiffs cite any such case). To the contrary, such laws are analyzed the same as federal ones in the Rule 60(b) context.

Consider, for example, *Friends of the Wild Swan v. EPA*, 74 F. App'x 718 (9th Cir. 2003). In that case, a judgment required Montana to develop water-quality standards for certain bodies of water on a "WQLS" list. But the district court was refusing to let the state remove any body of water from that list. *Id.* at 724. The Ninth Circuit held that the

---

[4] Plaintiffs make a formalistic argument that Defendants' motion "is facially insufficient" because it doesn't ask the Court to reject the parties' recitation regarding the constitutionality of the earlier policy. Resp. 6. The reason Defendants did not address this recitation is simple: "Relief [under Fed. R. Civ. P. 60(b)] is only available where there is a prospective effect to the challenged judgment . . . ." Steven Baicker-McKee & William M. Janssen, *Federal Civil Rules Handbook* 1297 (2023) (citations omitted). And a recitation of the parties on a legal point that was not litigated and carries no power to bind the State in the future does not have any prospective effect.

4

lower court abused its discretion in "refus[ing] to modify the judgment" because there was "a conflict with Montana's duties *under state law* periodically to revise the list of WQLSs." *Id.* (emphasis added); [5] *see also St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 272 n.9 (8th Cir. 2011) ("When a consent judgment mandates a remedy that violates state law, the remedy can override contrary state law . . . and thus allow the consent judgment to stand only if the remedy is *compelled* by federal law." (emphasis added)).

And indeed, it must be this way. To hold otherwise would be to render state governments vassals of the federal courts, forever beholden to unchangeable consent agreements entered into by long-gone public officials. *See* Frank H. Easterbrook, *Justice and Contract in Consent Judgments*, 1987 U. Chi. Legal F. 19, 34–37. That would be inconsistent with the caselaw around Rule 60(b), which is continually concerned with the preservation of state sovereignty/federalism and retaining accountability for state officeholders. *See* Def.'s Br. 3–4, ECF No. 37 (citations omitted); *Horne v. Flores*, 557 U.S. 433, 448–50; *see also PG Pub. Co. v. Aichele*, 705 F.3d 91, 116 & 117 n.29 (3d Cir. 2013) (holding parties do not have power to override state law via consent judgment); *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 341–42 (7th Cir. 1987) ("A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them."). Indeed, separation-of-powers and sovereignty concerns should be especially high here, where the case was not subject to any adversarial proceedings and was settled shortly after the election of a governor who was and continues to be partial to Plaintiffs' claims. *See, e.g.*, *Horne*, 557 U.S. at 448–49; Robert R. Detlefsen, *Government Consent Decrees and the Paradox of "Consent": A Critical Case Study*, 18 Just. Sys. J. 13, 14–16 (1995); Easterbrook, *supra*, at 33–34; Andrew M. Grossman, *Regulation Through Sham Litigation: The Sue and Settle Phenomenon*, Legal

---

[5] This use of state law to support modification was so uncontroversial that it was announced in an unsigned, unpublished opinion.

Memorandum (Heritage Found., D.C.) Feb. 25, 2014, at 2, 8–9, *available at* https://perma.cc/LZ3L-LR2W. An arrangement like that cannot operate to erase the legislature's authority to enact legislation in the future.

3. A RULE 60(B) MODIFICATION CAN BE SUPPORTED BY CHANGES TO THE RELEVANT CASELAW, EVEN WHEN THAT CASELAW IS NOT BINDING ON THE COURT THAT ISSUED THE JUDGMENT.

Plaintiffs are also wrong that a change in caselaw warranting modification of a judgment can only come from binding cases, *see* Resp. 11, 13. The error in Plaintiffs' position was identified by the Tenth Circuit in *Coca-Cola Co. v. Standard Bottling Co.*, 138 F.2d 788 (10th Cir. 1943). In that case, a consent decree had prohibited the defendant from selling any drink using the word "cola." *Id.* at 789. The decree was premised on the idea that "cola" referred specifically to Coca-Cola and thus was part of that company's trademark. Later, however, numerous other companies began selling cola drinks. So the district court modified its judgment. *Id.* The Tenth Circuit upheld the modification, not because of some intervening Circuit or Supreme Court case, but because "numerous decisions in many courts" had eroded the underlying premise of the consent judgment that "cola" referred to Coke and Coke alone. *Id.* at 790.

That is the situation we have here. No, there is no binding ruling that explicitly approves of sex-at-birth birth certificates. But we have gone from a condition where all the existing caselaw (on a then-very-new legal question) was on one side of the issue to one where the caselaw is diverse and unsettled.[6] The asserted legal basis for the consent

---

[6] Plaintiffs' listing of various cases on their preferred side of the divide does not refute Defendants' argument that, "since the Consent Judgment, other courts have begun to address the transgender-birth-certificate issue[, a]nd several judges have determined that policies prohibiting [sex-marker] changes do not offend the Constitution," Def.'s Br. 5. And while Defendants' motion tried to focus mostly on birth-certificate caselaw, *see* Def.'s Br. 5, because Plaintiffs cite a host of cases about transgender issues at large it is worth noting that the law on these issues is not uncontested either. *See, e.g., L.W. ex rel. Williams v. Skrmetti*, No. 23-5600, 2023 WL 4410576, at *6–8 (6th Cir. July 8, 2023); *Texas v. EEOC*, 633 F. Supp. 3d 824, 829–33 (N.D. Tex. 2022); *Vroegh v. Dep't of Corr.*, 972

judgment consequently no longer holds, especially given that (a) this Court never decided the issue for itself, and (b) the only litigated case within the Tenth Circuit that actually did decide the issue (before a judge from this very District) came out the other way, *see Fowler*, 2023 WL 4010694, at *8–24.

4. SB 180 AND THE CONSENT JUDGMENT ARE IRRECONCILABLE.

Plaintiffs (and the Governor in her amicus brief) are also wrong that SB 180 does not actually conflict with the consent judgment.[7] As noted in the initial motion, Def.'s Br. 2, SB 180 has two provisions that are relevant to the continued viability of the consent judgment: section 1(a)(1), which defines "[a]n individual's 'sex' [as] such individual's biological sex, either male or female, at birth;" and section 1(c), which requires public records to "identify each individual who is part of the collected data set as either male or female at birth." Each of these provisions *independently* requires Defendants to issue birth certificates that reflect the person's sex at birth—either provision would be sufficient to render the consent judgment in conflict with state law. But the arguments from Plaintiffs and amicus ignore section 1(a)(1) and focus entirely on section 1(c). *See* Resp. 9–10; Kelly Br. 9–11, ECF No. 39-1.

    4.1. *The Plain Language of SB 180 Requires the Department of Health and Environment to Issue Birth Certificates that Contain a Person's Sex at Birth.*

Section 1(a)(1) is enough by itself. That section establishes a precise definition of the word "sex" wherever it appears in Kansas law and government documents. Notwithstanding the consent judgment's cryptic references to "true sex, consistent with

---

N.W.2d 686, 702–03 (Iowa 2022). Furthermore, insofar as Plaintiffs rely on other consent judgments, Resp. 12, those settlements do not even have full res judicata effect on the parties to those cases, *see Arizona v. California*, 530 U.S. 392, 414–16 (2000), let alone sovereign states in other jurisdictions.

[7] A state court has already preliminarily rejected similar arguments regarding SB 180 as applied to driver's licenses. *See* Ex. A at 4.

7

[one's] gender identity,"[8] Consent J. 2, 3, "sex," in Kansas law, is a biological constant unaffected by how a person feels inside.[9] And Kansas birth certificates specifically refer to "SEX." Kan. Dep't of Health & Env't (KDHE) Form VS240 (attached as Ex. B). There is no entry for "gender identity" (nor could there be, since a newborn's internal subjective sense of gender would be impossible to identify at birth). Likewise, regulations imply that birth certificates will contain a person's "sex" because they allow for amending such certificates where "medical records substantiating the registrant's sex at the time of birth" and other evidence establish "that the sex was incorrectly recorded," Kan. Admin. Regs. § 28-17-20(b)(1). SB 180 was adopted with this preexisting linguistic background—i.e., with forms and regulations that already used the word "sex." The only reasonable conclusion is that the legislature intended these references to mean sex at birth, as section 1(a)(1) requires. It is thus impossible for Defendants to comply with section 1(a)(1) while continuing to allow people to amend

---

[8] Most sources treat "gender identity" as a concept distinct from "sex." *E.g.*, Am. Psychological Ass'n, *A Glossary: Defining Transgender Terms*, Monitor on Psychology, Sept. 2018, at 32 (defining "gender identity" as "[a]n internal sense of being male, female or something else, which may or may not correspond to an individual's sex assigned at birth or sex characteristics."); *Gender Identity*, PFLAG LGBTQ+ Glossary, https://pflag.org/glossary/ ("Gender identity does not always correspond to biological sex."); *Sex*, *id.* (treating "sex" as synonymous with "Biological Sex," "physical sex," "anatomical sex," and "sex assigned at birth" and stating "[b]iological sex is often conflated or interchanged with gender, which is more societal than biological, and involves personal identity factors."). The consent judgment's enigmatic language seems to be an attempt to shoehorn itself into preexisting regulations that allowed for "corrections to certificates and records" when "sex was incorrectly recorded." Kan. Admin. Regs. § 28-17-20 (2016).

[9] This is consistent with federal law, where even decisions that have recognized some level of protection from discrimination based on transgenderism "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020); *accord Adams ex rel. Kasper v. Sch. Bd.*, 57 F.4th 791, 812–13 (11th Cir. 2022) (en banc).

8

their birth certificates to remove sex at birth and replace it with something else.

Even considering only section 1(c), however, Plaintiffs' reading of the statute is incorrect. As mentioned above, section 1(c) requires government agencies that collect vital statistics to "identify each individual who is part of the collected data set as either male or female at birth." Plaintiffs claim that "such language conflicts with the Consent Judgment only . . . if the word 'only' is read into [it], such that it reads that [*sic*] '. . . shall *only* identify each individual . . . .'" Resp. 9.

But that is not true. The way the agency must "identify" each individual is "as either male or female *at birth*." SB 180 § 1(c) (emphasis added). Thus, when the options include male or female, the only legal referent is the sex observed at the time of birth, not some later-expressed statement of how the person feels. That is the way that the agency must "identify" each individual. There was no need to add "only" to the text to carry forth this requirement—it would have been redundant. This is particularly plain given the context in which the law was passed, vetoed, and then enacted via veto override. The law was the product of a debate over whether sex at birth or gender identity should be recorded by state agencies, and the legislature determined that sex at birth was the proper referent. Even if the law could be read to allow an agency to identify a person both by sex at birth and gender identity, as the Governor seems to suggest, *see* Kelly Br. 10, that would not absolve the agency of its duty to continue to "identify each individual who is part of the collected data set as either male or female at birth," § 1(c). When the agency is identifying individuals, that identification must include a sex-at-birth designation, regardless of what other information is present. And that duty would conflict with the consent judgment.

If anyone is reading words into the law, it is Plaintiffs. They believe that the state could identify people one way in its birth records (i.e., the data set required by SB 180) and another way on the physical birth certificate itself. Resp. 9–10. But that interpretation would require the law to say "identify each individual who is part of the

9

collected data set as either male or female at birth *only within that collected data set.*" Otherwise (i.e., as the statute is actually written) the obligation to identify people a particular way extends to all of KDHE's other activities—including issuing birth certificates.

Furthermore, a birth certificate is not some abstract document that is created anew each time a person requests it. It is a record of what the government's data set *already shows*.[10] Even if the State were to bifurcate "birth records" and "birth certificates," it would still have to have a data set of birth certificates—and would be required to identify persons in that data set based on sex at birth.

A final problem with Plaintiffs' strained reading of SB 180 is that it would render section 1(c) of the law a nullity. When interpreting a statute, a court presumes "that a legislature does not intend to enact useless or meaningless statutes." *In re Mueller*, 867 F.2d 568, 570 (10th Cir. 1989) (citing *City of Olathe v. Bd. of Zoning Appeals*, 696 P.2d 409, 413 (Kan. App. 1985)); *accord United States v. Heckenliable*, 446 F.3d 1048, 1051 (10th Cir. 2006); *see also State v. Fifer*, 881 P.2d 589, 591 (Kan. App. 1994) ("[J]udicial interpretations must be reasonable and sensible to effectuate the legislative design and the true intent of the legislature.").

If SB 180 *only* applied to data collection, section 1(c) would change nothing about KDHE's practices. That is because KDHE already had in its data set the sex at birth of every individual. *That is the sex that was listed when the individual's name and data were first entered shortly after the date of birth.* The mere act of collecting such information at birth puts it in the agency's records. If all SB 180 applied to was data-collection practices,

---

[10] KDHE provides "certified cop[ies]" of birth certificates. KDHE, Div. of Pub. Health, Birth Certificate, https://www.kdhe.ks.gov/1186/Birth-Certificate (last visited July 30, 2023); *accord* Consent J. 3. This presumes that the birth certificate is a "copy" of some preexisting record and KDHE is "certifying" that the copy they have handed out accurately reflects what is in its records already.

then, it would be a pointless law. The legislature must have had in mind KDHE's practice of allowing individuals to modify the sex on their birth certificates to reflect gender identity.

Thus, the plain language of the statute requires birth certificates to "identify individuals . . . as either male or female at birth." SB 180 therefore conflicts KDHE's current obligations under the consent judgment.

    4.2.    *The Legislative History Shows Both that the Legislature Knew SB 180 Would Ban Recording Gender Identity on a Person's Birth Certificate Instead of Sex and that Such a Ban Would Conflict with the Consent Judgment.*

Notwithstanding Plaintiffs' and the Governor's distorted reading of SB 180, it was plain at the time the legislature considered the bill that it would change how KDHE handled birth certificates. The testimony of Ellen Bertels, an attorney with Kansas Legal Services, is illustrative. Bertels' job is to "provide free legal representation to low-income transgender Kansans seeking name changes and gender marker changes." Tr. 2:5–7 (attached as Ex. C). And she opposed SB 180 because "it essentially bans gender marker changes on state-issued identity documents *like birth certificates* and driver's licenses." Tr. 2:12–15 (emphasis added); *accord* Tr. 2:20–25. Further, Bertels specifically discussed the consent decree in this case, saying the bill unavoidably conflicted with that decree. Tr. 3:11–22. Given this testimony, it is hard to say the legislature did not know what it was doing. An attorney—one who was a subject-matter expert in changing Kansas birth certificates, in fact, Tr. 2:5–7—told them that (a) the bill would ban the sorts of changes the consent judgment permits and (b) the bill would conflict with the very consent judgement at issue now.  There were no questions asked during Bertels' testimony, and no one on the committee disagreed with her description of what the law would accomplish, if enacted. It would be hard to find clearer evidence that, in passing SB 180, the legislature intended to do those two things.

Thus, the plain statutory language, the canons of statutory construction, and the

legislative history all demonstrate that SB 180 unavoidably conflicts with the consent judgment. SB 180 is therefore a significant change in the law that warrants modifying the judgment. The executive's old settlement—made in the absence of controlling state law—must yield to the legislature's definitive statement on the matter.

5. PLAINTIFFS' RECITATION OF THE SUPPOSED EQUITIES IN PLAY IS UNCONVINCING.

Plaintiffs also claim that "equitable considerations counsel against modifying the Consent Judgment." Resp. 13. But such considerations probably do not have a place in a Rule 60(b) motion based on a change in the law; Supreme Court caselaw indicates that modification is mandatory once a sufficient change in the law exists. *See Agostini v. Felton*, 521 U.S. 203, 215 (1997).

Regardless, Plaintiffs' reading of the equities is faulty. As Plaintiffs point out, "transgender people in Kansas have been living with the benefit of the Consent judgment for over four years." Resp. 14. In Plaintiffs' minds, that fact weighs in favor of keeping the judgment in place. However, that point actually cuts the other way: anyone who wanted to change his or her birth certificate has had four years to do so; if the person did not pursue a change in the intervening four years—especially in the face of a public campaign to encourage individuals to change their birth certificates before SB 180 went into effect, *see* Rachel Mipro, *Before Ban Goes into Effect, Lawyer Urges Trans Kansans to Change Gender Markers*, Kan. Reflector, May 19, 2023, https://bit.ly/3qctK2U—it is difficult to believe such persons will experience the substantial "material harms" that Plaintiffs suggest, Resp. 14. *See GTE Corp. v. Williams*, 731 F.2d 676, 678–79 (10th Cir. 1984) (delay in seeking relief undermines party's claim of substantial harm); *Krueger Int'l, Inc. v. Nightingale, Inc.*, 915 F. Supp. 595, 613 (S.D.N.Y. 1996) (Sotomayor, J.) (same).

Furthermore, it is not clear how Plaintiffs have standing to complain about such harms even if they do exist. Under the consent judgment, the individual plaintiffs

12

received their own amended birth certificates years ago, Consent J. 3–4. And the lone organizational Plaintiff does not even exist anymore. Resp. 5 n.2. While Defendants agree that Plaintiffs have a judicially cognizable interest in the continued enforcement of the consent judgment, Resp. 5, that interest merely gives the Court continued jurisdiction over the case. It does not set Plaintiffs up as the perpetual guardians of the rights of every person born in Kansas whose felt gender identity does not match the sex on their birth certificate (at least not without a proper class certification, which was never requested and did not occur).

Plaintiffs' claim that modifying the consent judgment "would run counter to the public interest," Resp. 15, is faulty too. In our system, legislatures are best positioned to determine the public interest. And, absent a constitutional violation,[11] their judgments are final. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 479–80 (1977); *Erie R.R. v. Williams*, 233 U.S. 685, 699–04 (1914); *Moody v. Bd. of Cty. Commm'rs*, 697 P.2d 1310, 1316 (Kan. 1985). That is fundamental to how a republican form of government works. Here, a supermajority of the Kansas Legislature has concluded that having immutable biological sex reflected on birth certificates is in the public interest. That should settle the matter as far as the Court is concerned.

Plaintiffs' position, on the other hand, is explicitly *anti*-democratic.  They use the mere fact of increased legislative interest in transgender issues across the country as grounds to argue that the Kansas Legislature should not be allowed to have an opinion on any such issue ever again. *See* Resp. 15. That argument is an invitation to tyranny. Legislatures are reacting to increased public attention on those issues, and are acting in an environment where there is no binding constitutional decision by a court constraining them in either direction. That is *precisely* the arena where a legislature should not be bound by past executive-branch settlements in which it was never

---

[11] And there has been no such finding here. *Supra*, pt. 1.

involved (particularly when the settlement was the product of an agreement between parties seeking the same policy outcome).

If SB180 is unconstitutional, that should be determined through the crucible of litigation, not through an adversarial-in-name-only consent judgment. The Court should modify the judgment, allow the legislature to exercise its customary powers, and let any constitutional challenge run through the normal judicial process. The suit may be restored, or a new suit may be brought. But an agreement between aligned parties that violates subsequent law is not, and cannot be, the end of the matter. *See* Easterbrook, *supra*, at 37 ("If a contract with the government fails, the remedy is either damages . . . or nothing. 'Nothing' here means a vacation of the decree and a restoration of the suit . . . ." (citations omitted)).

Respectfully submitted this 1st day of August, 2023.

KRIS W. KOBACH
Attorney General of Kansas

s/ Daniel E. Burrows
Daniel E. Burrows
Bar Number 30009
Chief Deputy Attorney General
Office of the Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
Telephone: (785) 368-8435
Fax: (785) 296-3131
Email: daniel.burrows@ag.ks.gov